**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*West Boca Medical Center, Inc. v.*<br>*AmerisourceBergen Drug Corp., et al.*<br>Case No. 18-op-45530-DAP | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**REPLY IN SUPPORT**
**OF DISTRIBUTORS' MOTION TO DISMISS**

## TABLE OF CONTENTS

ARGUMENT ...................................................................................................................... 3

I.      THE DERIVATIVE INJURY RULE BARS THE HOSPITAL'S CLAIMS.................... 3

II.     THE RICO CLAIMS SHOULD BE DISMISSED........................................................... 4

      A.      The Opposition Fails to Demonstrate a Direct Injury to the Hospital. ................... 4

      B.      The Opposition Fails to Demonstrate Injury to "Business or Property." ............... 7

      C.      The Opposition Fails to Establish Predicate Acts and an Enterprise..................... 8

      D.      The Opposition Fails to Establish a Section 1962(a) Claim. ............................... 10

      E.      The Opposition's Section 1962(d) Arguments Are Misplaced............................. 10

III.    THE HOSPITAL'S PUBLIC NUISANCE CLAIM FAILS. ........................................... 11

IV.     THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED. .......................................... 13

      A.      The Complaint Fails Adequately to Allege Duty. ................................................. 13

      B.      The Hospital Has Failed Adequately to Allege Breach of Duty........................... 15

V.      THE HOSPITAL DOES NOT ADEQUATELY ALLEGE PROXIMATE CAUSE....... 15

VI.     THE CONSUMER FRAUD CLAIM SHOULD BE DISMISSED................................. 18

VII.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED. .......................... 19

VIII.   THE IMPLIED WARRANTY CLAIM SHOULD BE DISMISSED. ............................ 20

ii

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269 (S.D. Fla. 2013)............................20

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000)............................11, 12

*Allstate Ins. v. Med. Evaluations, P.C.*, 2014 WL 2559230 (E.D. Mich. June 6, 2014) ........................................................................................................................................8

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) ...............................9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................9

*Beck v. Prupis*, 529 U.S. 494 (2000)..................................................................10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................11

*Blair v. Wachovia Mortg. Corp.*, 2012 WL 868878 (M.D. Fla. Mar. 14, 2012) ..........................18

*Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358 (S.D. Fla. 2001)....................................16

*Burgess v. M/V Tomano*, 370 F. Supp. 247 (D. Me. 1973)............................................13

*Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323 (S.D. Fla. 2014) .........................................20

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474 (6th Cir. 2017) ........................16

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010)..........................5

*City of Miami v. Citigroup Inc.*, 801 F.3d 1268 (11th Cir. 2015)..................................................19

*Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463 (S.D. W. Va. 2013) ..............................................18

*Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018 (N.D. Ohio 2013) ...........................................10

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015) ........................................................................................................................................5

*In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013).................................5

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ..................................................................................3

*Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556 (6th Cir. 2013) (en banc)........................................................................................................................................7

*Laborers Local 17 Health & Benefit Fund. v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999) ........................................................................................................4

*Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346 (S.D. Fla. 2003) ....................................16

*Liberty Mut. Fire Ins. v. JM Smith Corp.*, 602 F. App'x 115 (4th Cir. 2015) (per curiam) .......................................................................................................................17

*Libov v. Readix, Inc.*, 2011 WL 13216996 (S.D. Fla. Sept. 8, 2011) ............................................9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ........................................................................................................9

*Miceli v. Dyck-O'Neal, Inc.*, 2016 WL 7666167 (M.D. Fla. Aug. 9, 2016) ...............................19

*NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 4357 (E.D.N.Y. 2003) ...........................................16

*Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir. 1989) ..........................................10

*Owens-Benniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300 (M.D. Fla. 2017) ...........................................................................................................................19

*Perry v. Am. Tobacco, Co.*, 324 F.3d 845 (6th Cir. 2003) ........................................................6, 7

*Powell v. Wal-Mart Stores, Inc.*, 303 F. App'x 284 (6th Cir. 2008) (per curiam).........................9

*Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016) ........................................................9

*Regence Blueshield v. Philip Morris, Inc.*, 40 F. Supp. 2d 1179 (W.D. Wash. 1999) ............................................................................................................................4

*Reo v. Caribbean Cruise Line, Inc.*, 2016 WL 1109042 (N.D. Ohio Mar. 18, 2016) ............................................................................................................................9

*State Farm Mut. Auto. Ins. Co. v. Brown*, 2017 WL 1291995 (S.D. Fla. Mar. 30, 2017) ...........................................................................................................................20

*State Farm Mut. Auto. Ins. v. Kugler*, 2011 WL 4389915 (S.D. Fla. Sept. 21, 2011) ............................................................................................................................8

*State Farm Mut. Auto. Ins. v. Physiomatrix, Inc.*, 2014 WL 555199 (E.D. Mich. Feb. 12, 2014) ..........................................................................................................8

*State Farm Mut. Auto. Ins. v. Universal Health Grp., Inc.*, 2014 WL 5427170 (E.D. Mich. Oct. 24, 2014) ...............................................................................................8

*State Farm Mut. Auto. Ins. v. Vital Cmty. Care, P.C.*, 2018 WL 2194019 (E.D. Mich. May 14, 2018) ................................................................................................8

*State Farm Mut. Auto. Ins. v. Warren Chiropractic & Rehab Clinic P.C.*, 2015
WL 4724829 (E.D. Mich. Aug. 10, 2015) ...............................................................8

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d
912 (3d Cir. 1999) .....................................................................................................18

*Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc.*, 21 F. Supp. 2d 664
(E.D. Tex. 1998) ........................................................................................................18

*Traxler v. PPG Industries, Inc.*, 158 F. Supp. 3d 607 (N.D. Ohio 2016) .....................18

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004).................................5, 7

*United Food & Com. Workers Unions, Emp'rs Health & Welfare Fund v. Philip
Morris, Inc.*, 223 F.3d 1271 (11th Cir. 2000) ...........................................................3

*Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994).............................................10

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ..................................18

*Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316 (M.D. Fla. 2015) .................20

*Wilhite v. Howmedica Osteonics Corp.*, 833 F. Supp. 2d 753 (N.D. Ohio 2011) .........4

## STATE CASES

*Ankers v. Dist. Sch. Bd. of Pasco Cty.*, 406 So. 2d 72 (Fla. App. 1981) ......................15

*Anthony v. Slaid*, 52 Mass. 290 (1846) ..........................................................................3

*Banta v. Rosier*, 399 So. 2d 444 (Fla. App. 1981).......................................................15

*Chevron U.S.A., Inc. v. Forbes*, 783 So. 2d 1215 (Fla. App. 2001) .............................14

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004).........................16

*Clark v. Boeing Co.*, 395 So. 2d 1226 (Fla. App. 1981)...............................................16

*County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004) .............11

*Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216 (Fla. 2010)........................................13

*Durrance v. Sanders*, 329 So. 2d 26 (Fla. App. 1976) .................................................16

*Heist v. Lock & Gunsmith, Inc.*, 417 So. 2d 1041 (Fla. App. 1982).............................17

*Hoffman v. Bennett*, 477 So. 2d 43 (Fla. App. 1985)...................................................17

*Kohl v. Kohl*, 149 So. 3d 127 (Fla. App. 2014) ...........................................................14

*Shamhart v. Morrison Cafeteria Co.*, 32 So. 2d 727 (Fla. 1947) (en banc) ..................................16

*State v. Lead Indus. Ass'n*, 941 A.2d 428 (R.I. 2008) ...................................................................16

*Walker v. Butler*, 461 So. 2d 249 (Fla. App. 1984) .......................................................................14

*Watson v. Lucerne Mach. & Equip., Inc.*, 347 So. 2d 459 (Fla. App. 1977)................................16

## OTHER AUTHORITIES

21 C.F.R. § 1306.04(a)......................................................................................................................6

DEA, Aggregate Production Quota History for Selected Substances 2003–2013
   (Oct. 2, 2012) ................................................................................................................................2

Restatement (Second) of Torts § 821B ...........................................................................................11

The Opposition demonstrates that the Hospital's claims have at least three global problems that plainly require dismissal, in addition to grounds specific to the individual causes of action.   First, the Opposition makes clear that the Hospital's alleged injuries are wholly derivative of the injuries of "patients whose medical conditions result directly from or are made more difficult by a history of opioid use."  Opp. 1.  It is the "demands of caring for these patients" that "has strained the resources of West Boca."  *Id.*  Thus, while the Hospital may be on the "front line" of caring for those who are allegedly directly injured (opioid users), *id.* at 3, its alleged injuries are textbook derivative injuries for which, under established precedent, it cannot recover.  The Hospital may label these injuries "direct," but established law holds otherwise.

Second, when the Hospital claims to have been a "direct target[] of the Defendants' marketing … scheme" and that its "physicians prescribed Defendants' products every day based on misleading—indeed, fraudulent—information," *id.* at 4, the Hospital is speaking of its claims against Manufacturers, not Distributors.  It tries to mask this fact in many places by repeatedly using "Defendants" when the clear reference is to Manufacturers alone.  But the Opposition's introduction is unambiguous, stating that "Marketing Defendants [i.e., Manufacturers] employed a sophisticated campaign to convince the medical community and the public that opioids were safe—essentially, that high doses of pharmaceutical-grade heroin could treat chronic pain, without significant risk of addiction."  *Id.* at 2.  The Hospital does not allege that Distributors made any misrepresentations to doctors, hospitals, or the public regarding the safety, efficacy, or addictive properties of opioid medications—nor could it.  Thus, if physicians (be they Hospital doctors or others) were misled into overprescribing opioids, it was not by Distributors.

Third, the Hospital's claims against Distributors are inconsistent with its claims against Manufacturers and with its assertion that its own doctors and pharmacists were duped by

Manufacturers.  The Hospital seeks to hold Distributors liable for "flood[ing]" the community with opioids and failing to report pharmacy orders of unusual size, frequency, or pattern.  *Id.* But that claim makes no sense.  If, as the Hospital alleges, Manufacturer Defendants' "deceptive messages tainted every source upon which doctors rely for information, and prevented doctors and medical institutions from making informed treatment decisions," *id.*, then the vast increase in prescriptions that paralleled the Manufacturers' alleged marketing campaign reflects the misguided, but nevertheless considered, professional judgment of physicians about the proper treatment of chronic pain.  In other words, if, as alleged, the marketing campaign duped the Hospital's doctors, *id.*, then the prescriptions written by those doctors were legitimate, pharmacies had a responsibility to dispense them, and Distributors did nothing wrong in supplying the pills the pharmacies ordered to fill those prescriptions.

That DEA steadily increased the production quota for opioids from 1995 to 2013[1] reflected its belief that the rise in opioid prescriptions was prompted by past under-treatment of pain and a growing medical need for prescription opioids.  The claim that Distributors should have reported the steady upsurge in pharmacy orders for prescription opioids as "suspicious" suggests that Distributors (who have no special knowledge about the design, formulation, and operation of the thousands of drugs they transport) were in a position to second-guess both the doctors, who were prescribing the medications pursuant to the new medical consensus, and DEA, which determined that there was an increasing legitimate medical need for the medications.

Especially against this backdrop, the Hospital's assertion that its full-service pharmacy was a victim of a "distribution scheme[]" is misplaced.  Opp. 4.  Even if the Complaint alleged

---

[1]  *See, e.g.*, DEA, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012), https://web.archive.org/web/20121016220702/https://www.deadiversion.usdoj.gov/quotas/ quota_history.pdf (showing approved quota for sale of oxycodone tripled between 2003 and 2013).

that the Hospital had purchased opioids from Distributors, they sell opioids to pharmacies only in the amounts that *the pharmacy* orders.  Thus, if West Boca's hospital pharmacy had too many opioids, it was because *it ordered too many*, not because it was the victim of a "distribution scheme."  And, if the Hospital's own doctors were misled by Manufacturers' alleged marketing scheme and did not realize that their prescriptions were excessive or unnecessary, then there is no basis for Distributors to have known that or to be held liable for it.

In short, the Hospital is the wrong plaintiff and Distributors are the wrong defendants. All of the Hospital's claims against Distributors should be dismissed.

## ARGUMENT

## I.    THE DERIVATIVE INJURY RULE BARS THE HOSPITAL'S CLAIMS.

The Hospital's claim for unreimbursed costs of treatment is derivative.  Distributors' opening brief ("Br.") cited myriad cases—dating as far back as 1846—holding that "a *health-care provider has no direct cause of action in tort against one who injures the provider's beneficiary, imposing increased costs upon the provider*."[2]  Thus,

> For more than 100 years state and federal courts have adhered to the principle
> (under both state and federal law) that the victim of a tort is the proper plaintiff,
> and that insurers or other *third-party providers of assistance and medical care to
> the victim may recover only to the extent their contracts subrogate them to the
> victim's rights*.[3]

The Hospital makes no effort to argue that the law is different under RICO or the common law of Florida.  It cites no case that rejects this bedrock principle, and it offers to explanation for why the rule should not be applied here.

---

[2]    *United Food & Com. Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000) (citing *Anthony v. Slaid*, 52 Mass. 290, 290–91 (1846)); *see* Br. 4–5 & n.5.  Unless otherwise stated, all emphasis in quotations herein has been added and internal quotation marks and citations omitted.

[3]    *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999) (collecting cases).

3

The Hospital instead strains to distinguish this case from the tobacco cases.  Opp. 19–21. But the rule invoked by Distributors is one of general applicability.  It does not turn on any special feature of the tobacco cases, and the Hospital does not attempt to explain why its distinctions matter.  The Hospital is a healthcare provider; it seeks to recover the increased costs of treating opioid users, allegedly as a result of Distributors' wrongdoing; accordingly, the Hospital's patients, and not the Hospital, are the proper plaintiffs to assert those claims.

The Hospital argues that its "injuries extend well beyond the unreimbursed costs of treatment," pointing to inchoate categories such as "infrastructure expense," "capital improvement costs," and "operating costs."  *Id.* at 4, 7, 35, 49.  But the Complaint contains no such allegations, and a plaintiff "cannot amend [its] complaint by means of" its "opposition." *Wilhite v. Howmedica Osteonics Corp.*, 833 F. Supp. 2d 753, 762 (N.D. Ohio 2011).[4]

## II.     THE RICO CLAIMS SHOULD BE DISMISSED.

For the reasons stated in the *Summit County* and *Monroe County* replies, the Hospital's RICO claims fail.  Summit Reply, Dkt. 744 at Part I; Monroe Reply, Dkt. 820 at Part II.

### A.     The Opposition Fails to Demonstrate a Direct Injury to the Hospital.

The Hospital asserts that Distributors violated a purported duty to prevent diversion by failing to report or halt suspicious orders.  Compl. ¶ 621.  But the Opposition does not dispute

---

[4]   Contrary to the Hospital's suggestion, Opp. 34 n.106, no such allegations are found in paragraphs 51 to 58.  Those paragraphs allege that the Hospital treats patients "for opioid-related conditions," and incurs "substantial unreimbursed charges" for that treatment.  Compl. ¶¶ 53, 55.  While paragraphs 57 and 58 use the phrase "operational costs," the allegations make clear that this refers to costs incurred in treating opioid users and addicts.  In any event, "infrastructure expense" and "operational costs" are not recoverable as "[n]o amount of semantic gymnastics can detract from the conclusion that the[] claims are completely derivative of the personal injuries to [patients] allegedly caused by the defendants' conduct.  *Regence Blueshield v. Philip Morris, Inc.*, 40 F. Supp. 2d 1179, 1184 (W.D. Wash. 1999) ("The only harm to the [plaintiff's] infrastructure or financial well-being that the defendants could have caused is the greater financial burden of covering higher health care costs …."); *see Laborers Local 17 Health & Benefit Fund. v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999) (holding that injuries "labeled as 'infrastructure harm' or 'harm to financial stability'" were not recoverable because they were "indirect" and "purely contingent on harm to third parties").

4

that no person (let alone hospital) would be harmed by this purported violation unless, after Distributors delivered FDA-approved medicines to licensed dispensaries, (1) a doctor mis-prescribed the drugs, (2) a pharmacist improperly dispensed the drugs, (3) a patient misused the medicine or improperly gave it to someone else, or (4) a criminal stole the medicine.  Under established law, the indirect and attenuated connection between Distributors' alleged wrongdoing and the Hospital's injury is fatal to the Hospital's RICO claim.  *See* Br. at Part II; Summit Br., Dkt. 491-1 at Part I.  None of the Hospital's contrary arguments has merit.

First, *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613–15 (6th Cir. 2004), does not help the Hospital.  *Trollinger* recognized the rule that a complaint fails to state a RICO claim if the plaintiff's alleged injuries are derivative or indirect.  There, however, the alleged injuries to plaintiff employees from the defendant employer's alleged scheme to hire illegal alien workers were not derivative because the complaint alleged that the defendant "directly employed the four plaintiffs, … directly paid them and … directly injured [them] by paying them less."[5]

Second, the *Neurontin* and *Avandia* cases are unavailing **as to Distributors**.  Both cases concerned drug **manufacturers'** allegedly fraudulent sales and marketing practices, and in both instances the courts held that the intervening conduct of physicians did not break the causal chain because the manufacturers themselves targeted the doctors with a fraudulent scheme designed and intended to influence the prescribing decisions of doctors.[6]  Whatever the significance of those decisions as to Manufacturers, they do nothing to establish a direct connection between

---

[5]  As the Sixth Circuit has observed, "there is no per se rule against dismissing a complaint for failure to adequately plead proximate cause.  In fact, subsequent to *Trollinger*, the Supreme Court dismissed the complaint in *Anza* [*v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)] at the motion to dismiss stage for failure to plead proximate cause."  *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010).

[6]  *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 645 (3d Cir. 2015); *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 38 (1st Cir. 2013).

5

Distributors' alleged conduct, which does not involve marketing opioid products to doctors, and the Hospital's injury.

The Hospital asserts that "Defendants" directly targeted the Hospital, *e.g.*, Opp. 4, 13, 20, but it is unclear what that vague claim is supposed to mean as to Distributors.  If the claim is that the Hospital's doctors were targeted with allegedly deceptive marketing regarding the risks or benefits of opioids, Distributors are not alleged to have done that.  If the claim is that the Hospital purchased opioids from Distributors (which the Hospital's pharmacists then gave to patients), that too cannot give rise to a RICO claim:  either the purchases were intended to meet a legitimate medical need (and Distributors did nothing wrong in filling them) or they were illegitimate (and the Hospital's own wrongdoing was the proximate cause of any injury).[7]

Fourth, the Hospital protests that "this is not *Tobacco* redux," *id.* at 4, but does not explain why its alleged injuries are any more direct or less derivative than those alleged by the hospitals and other third-party payors in the tobacco cases.  *See* Br. at Part I; *Perry v. Am. Tobacco, Co.*, 324 F.3d 845, 849 (6th Cir. 2003) (agreeing with "eight other federal circuit courts" that dismissed as "too remote" "cost-recovery claims against the tobacco industry" by third-party payors).  The Opposition argues that, unlike cigarettes, which "do not treat disease," opioids are "medications" prescribed by "trusted sources" and subject to a detailed "regulatory framework."  Opp. 19–20.  But that reality cuts against the Hospital's claim.  In the tobacco cases, the chain of causation was too attenuated even though the defendants sold their products directly to the consumers who were harmed by them.  Here, in contrast, Distributors sell

---

[7]  Contrary to the Hospital's assertions, its "in-house pharmacy" did not "ha[ve] to fill" opioid prescriptions when presented.  Opp. 8.  In the event of an *improper* prescription, the Hospital's pharmacy had a legal duty not to dispense the drugs, 21 C.F.R. § 1306.04(a), and it cannot hold Distributors liable for its own failure to perform that duty.  In the case of a *proper* prescription, Distributors are no more at fault for providing the pills to the Hospital than the Hospital is for providing the pills to a patient.  This is so even if a Hospital doctor wrote the prescription after being influenced by the Manufacturers' allegedly fraudulent marketing campaign.

(i) FDA-approved medicines, (ii) subject to DEA quotas set on the basis of legitimate medical need, (iii) to licensed pharmacies, which dispense the medicines to patients (iv) only after a licensed physician writes a proper prescription.  If the causal chain between tobacco sellers and third-party payors was too indirect, then *a fortiori* it is too indirect here.

Finally, the Hospital is wrong (Opp. 16–19) that mere foreseeability is sufficient to allege proximate causation in the RICO context.  *See* Summit Reply at Part I.B.1; *Perry*, 324 F.3d at 850 ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury."); *see also infra* Part V.

### B.  The Opposition Fails to Demonstrate Injury to "Business or Property."

According to the Complaint, the Hospital has incurred "substantial unreimbursed charges for its treatment of patients with opioid conditions."  *E.g.*, Compl. ¶ 55.  The Opposition argues that the Hospital may recover those charges as injury to its business or property because its "claims are not for personal injuries."  Opp. 8.  But that argument ignores clear Sixth Circuit precedent, which holds that a RICO plaintiff may not recover either for "personal injuries" or for "***pecuniary losses flowing from those personal injuries***."  *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 565 (6th Cir. 2013) (en banc).  Because the Hospital's "unreimbursed" costs "for its treatment of patients with opioid conditions" undeniably "flow[]" from th[e] personal injuries" of those patients, their recovery is barred under Sixth Circuit precedent.[8]

The Hospital points to a series of cases holding that *Jackson* does not bar RICO claims by insurance companies.  Opp. 9–10 & n.19.  But the damages alleged in those cases—fraudulent

---

[8]  *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004), sheds no light whatsoever on the question whether the Hospital was injured in its business or property.  The case pre-dates *Jackson*, does not involve personal injuries to anyone, and does not discuss RICO's "business or property" limitation.

billing for services "never performed" or "not medically necessary"[9]—did not flow from personal injuries.  Rather, the "patients" in those cases did not exist, did not receive any treatment, or received unnecessary treatment (thus, unrelated to any personal injury).  These insurance cases are inapposite because the Hospital does not allege that Distributors submitted fraudulent bills.

The Hospital cannot save its claim ***against Distributors*** by asserting injury based on "overpayment for opioids."  Opp. 9.  Citing *Avandia*, the Opposition argues that the Hospital's payments for "drugs that were marketed deceptively" constitute an injury to its business or property.  *Id.* at 6.[10]  Again, the Complaint alleges that Manufacturers, not Distributors, conducted a fraudulent marketing scheme.  If the Hospital pharmacy purchased opioids from a Distributor based upon a Hospital doctor's good-faith but mistaken belief that the prescription was medically appropriate, the Distributor's actions in filling the Hospital's order was no more wrongful than the actions of the Hospital, whose doctor wrote the prescription and whose pharmacist filled it.

### C.   The Opposition Fails to Establish Predicate Acts and an Enterprise.

The Hospital claims it has "alleged predicate acts by Distributor[s] with specificity," Opp. 22 (citing Compl. ¶¶ 854, 861, 870–71), but none of the cited paragraphs identifies a specific misrepresentation made by a Distributor or a specific mailing or wire sent by

---

[9]   *State Farm Mut. Auto. Ins. v. Vital Cmty. Care, P.C.*, 2018 WL 2194019, at *1 (E.D. Mich. May 14, 2018) ("scheme to submit fraudulent bills and false documentation for treatment and services that were never performed or were not medically necessary"); *see State Farm Mut. Auto. Ins. v. Universal Health Grp., Inc.*, 2014 WL 5427170, at *1 (E.D. Mich. Oct. 24, 2014) (similar); *Allstate Ins. v. Med. Evaluations, P.C.*, 2014 WL 2559230, at *1 (E.D. Mich. June 6, 2014) (similar); *State Farm Mut. Auto. Ins. v. Physiomatrix, Inc.*, 2014 WL 555199, at *1 (E.D. Mich. Feb. 12, 2014) (similar); *State Farm Mut. Auto. Ins. v. Kugler*, 2011 WL 4389915, at *1 (S.D. Fla. Sept. 21, 2011) (similar); *State Farm Mut. Auto. Ins. v. Warren Chiropractic & Rehab Clinic P.C.*, 2015 WL 4724829, at *1 (E.D. Mich. Aug. 10, 2015) (similar).

[10]  The Opposition also cites *Neurontin*, but that case did not address the RICO "business or property" requirement at all.

8

Distributors in furtherance of a purportedly fraudulent scheme, as required by Rule 9(b).  The Opposition also asserts that Distributors made (unspecified) false statements to regulators in order to secure "high production quotas."  Opp. 22.  But DEA set the quotas based on applications submitted by Manufacturers; Distributors play no role in quota-setting.  Summit Reply at 13 n.9.

The Hospital's enterprise arguments are similarly off-target.  *See* Br. 11–12.  First, while the Hospital quotes the allegation that "Marketing and Distributor Defendants were not two separate groups" but "operated as a united entity," Opp. 24 (citing Compl. ¶ 763), these generic and conclusory allegations, standing alone, are insufficient.[11]  Second, the Hospital argues that Defendants shared "the common purpose of obtaining significant monies and revenues," *id.*, but an allegedly "shared" profit motive is insufficient to establish a RICO enterprise.[12]  Third, the Hospital asserts that Distributors "worked with Marketing Defendants" to influence legislative and regulatory action.  *Id.*  But, as the Hospital concedes, the *Noerr-Pennington* doctrine bars RICO claims based on First Amendment petitioning activity.[13]  Finally, the Hospital argues that Distributors and Manufacturers interacted through their participation in trade associations, *id.*, but "participation in trade organizations provides no indication of conspiracy."  *Am. Dental*

---

[11]  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) ("conclusory" allegations "not entitled to be assumed true"); *see Libov v. Readix, Inc.*, 2011 WL 13216996, at *1 (S.D. Fla. Sept. 8, 2011) (dismissing RICO claims where plaintiffs "engaged in impermissible group pleading by lumping all Defendants together, rather than differentiating between the individual Defendants"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129, at *20 (S.D.N.Y. Mar. 15, 1994) ("[W]here there are multiple defendants [in a RICO claim], plaintiffs must identify with particularity the roles of the individual defendants …." (alteration in original)).

[12]  *See, e.g.*, *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352 n.3 (11th Cir. 2016) ("[S]ince making money is the purpose of every for-profit corporation … this purpose is wholly insufficient to establish an association-in-fact enterprise").

[13]  *See Powell v. Wal-Mart Stores, Inc.*, 303 F. App'x 284, 285 (6th Cir. 2008) (per curiam) (affirming dismissal after plaintiff "failed to respond to the [defendant's] argument" in a motion to dismiss); *Reo v. Caribbean Cruise Line, Inc.*, 2016 WL 1109042, at *5 (N.D. Ohio Mar. 18, 2016) (plaintiffs conceded an argument "not opposed or addressed" in the Opposition); *see also* Br. 10 n.10.

*Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010); *see* Cabell Reply, Dkt. 818 at 9 n.13.

### D.    The Opposition Fails to Establish a Section 1962(a) Claim.

Section 1962(a) requires allegations of a direct "injury stemming from [] ***investment***, distinct from injuries stemming from predicate acts." *Vemco, Inc. v. Camardella*, 23 F.3d 129, 133 (6th Cir. 1994) (emphasis in original).  The Opposition does not explain how each Distributor's reinvestment of profits into its own business—as opposed to its predicate acts— injured the Hospital.[14]  Accordingly, the Section 1962(a) claim should be dismissed.[15]

### E.    The Opposition's Section 1962(d) Arguments Are Misplaced.

A RICO conspiracy claim must allege injury from "an act that is independently wrongful under RICO." *Beck v. Prupis*, 529 U.S. 494, 505–06 (2000).  Requiring a Section 1962(d) claim to allege all the elements of an underlying RICO violation "does not render [§ 1962(d)] mere surplusage." *Id.*  While Section 1962(d) permits a plaintiff who otherwise pleads a valid RICO claim against a defendant to "sue [that defendant's] co-conspirators," *id.*, it is of no help to the Hospital because it has not pled a valid claim under a substantive RICO provision.

The Hospital's conspiracy claim also fails because it has not adequately alleged an "illicit agreement" on the part of Distributors to "violate the substantive RICO provisions." *Huff v. FirstEnergy Corp.*, 972 F. Supp. 2d 1018, 1039 (N.D. Ohio 2013).  The Hospital asserts that it alleged the "when, where, or between whom" of an illicit agreement (Opp. 30), but each

---

[14]  The Hospital argues that "the False Narrative Enterprise continued to operate and generate profits, which in turn, enabled Defendants to make payments to Front Groups and KOLs and otherwise to promote the use of opioids."  Opp. 26.  But no *Distributor* allegedly made such payments or "promote[d] the use of opioids."  And the relevant "enterprises" for the Section 1962(a) claim are "[e]ach Defendant" individually, not the so-called False Narrative Enterprise.  Compl. ¶ 888.

[15]  *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir. 1989) is not to the contrary.  "Unlike the plaintiffs in *Newmyer*, [the Hospital] does not allege that [Distributors were] built with racketeering proceeds amassed from others prior to [the Hospital's] association with [Distributors]." *Vemco, Inc. v. Camardella*, 23 F.3d 129, 133 (6th Cir. 1994).

paragraph cited is conclusory, does not relate to Distributors, or is simply irrelevant to the illicit agreement question.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("a bare assertion of conspiracy will not suffice").

## III.  THE HOSPITAL'S PUBLIC NUISANCE CLAIM FAILS.

For the reasons stated in Distributors' *Summit County*, *City of Chicago*, and *Broward County* replies, the Hospital's public nuisance claim fails.  The claim also fails because the Hospital does not plead, and cannot show, the "special injury" needed when a private plaintiff sues for public nuisance.  Even under the Hospital's incorrect view of the "public right" requirement,[16] the Hospital does not explain how opioid addiction can constitute both an injury to "a right common to the general public," ***and also*** an injury peculiar to the Hospital.  *See* Restatement (Second) of Torts § 821B (Am. Law Inst. 1979); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000) (holding hospital lacks standing where "[t]he Hospitals' injuries are derivative of the nonpaying patients' injuries").[17]  No matter who pays for the treatment, the character of the alleged injury is the same.

The Hospital attempts to sidestep this argument by identifying a number of costs supposedly unrelated to the reimbursement of medical expenses and particular to the Hospital.  Opp. 34–35 (citing Compl. ¶¶ 51–58).  None of these costs, however, was alleged in the Complaint.  Paragraphs 51 through 58 of the Complaint describe exclusively the healthcare-related expenses for which the Hospital seeks ***reimbursement***, and which concern the injuries allegedly suffered by the public at large.

---

[16]  As Distributors have explained, opioid-related injuries are, if anything, invasions of private rights.  *See* Summit Reply, Dkt. 744 at Part II.B.1.

[17]  *See also County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1048 (Ill. App. Ct. 2004) ("The plaintiffs' position is virtually identical to that of an insurance company seeking to recoup its medical payments to its insured from the party at fault," which "must proceed via a subrogation action or not at all.").

Next, the Hospital attempts to distinguish cases like *Allegheny General Hospital* that dismissed nearly identical public nuisance claims by a hospital because they "did not sufficiently allege … a harm different from and of greater magnitude than the harm suffered by the general public." *Allegheny Gen. Hosp.*, 228 F.3d at 446.  In scattershot fashion, the Hospital suggests five bases to distinguish *Allegheny*, none of which is of any consequence.

First, the Hospital suggests that it "sufficiently alleges … a causal connection" supported by "substantial scientific evidence," Opp. 37, but does not explain why this matters to the question of whether it has a special injury distinct from the public's alleged injury.  In any event, the Hospital does not explain how this causal connection is more direct or more supported by scientific evidence than that between tobacco manufacturers' deceptive marketing of cigarettes and smoking-related injury in *Allegheny*.[18]  Second, the Hospital says that it "alleged direct injuries that only a hospital could have sustained," Opp. 37, but does not explain how Allegheny General Hospital's injuries were less direct or less peculiar to hospitals.[19]

Third, the Hospital argues that it "sufficiently alleges intentional conduct" based on "Defendants'" alleged marketing campaign.  Opp. 37.  But that is no distinction because the same allegations were made about the tobacco companies in *Allegheny*.[20]  More importantly, the argument is not relevant to Distributors because the Complaint does not allege that Distributors were part of the Manufacturers' purported marketing campaign.

---

[18]  *Allegheny Gen. Hosp.*, 228 F.3d at 439 ("There is a causal connection between the Tobacco Companies' alleged conspiracy and the Hospitals' injuries—i.e., but-for that alleged conspiracy, the injuries would not have arisen."); *see also infra* Part V.

[19]  *Compare* Compl. ¶¶ 55–58 (alleging that the Hospital incurred unreimbursed charges from its legal obligation to treat patients regardless of their ability to pay), *with Allegheny Gen. Hosp.*, 228 F.3d at 434 ("The law required the Hospitals to provide treatment to these patients regardless of their ability to pay for it.  The Hospitals therefore reason that the Tobacco Companies' wrongful acts increased the unreimbursed costs the Hospitals incurred.").

[20]  *Allegheny Gen. Hosp.*, 228 F.3d at 439 ("The Hospitals allege that the Tobacco Companies specifically intended to shift the costs of the nonpaying patients' … to the Hospitals.").

12

Fourth, the Hospital suggests that it "directly purchased opioids from the Defendants" (albeit without any allegation specific to any Distributor).  Opp. 37.  But it does not explain how—regarding Distributors—its direct purchases are a logical or relevant basis for distinguishing *Allegheny*.  The Hospital's public nuisance claim is premised on the over-use of prescription opioids arising from allegedly deceptive marketing that encouraged doctors to over-prescribe opioid medications for chronic pain.  The alleged nuisance is the over-***use*** and resulting addiction, not pharmacy purchases of prescription opioids.  The Hospital's purchases of opioid medications stem from the decisions made by the Hospital's own personnel to prescribe and dispense opioids.  The Hospital cannot hold Distributors liable—for public nuisance or anything else—for decisions made by the Hospital's own personnel.

Finally, the Hospital suggests that, unlike tobacco, opioids cause injury "almost immediately."  Opp. 37.  But here too, the Hospital offers no explanation at all as to why this particular distinction (between two lawfully sold, yet addictive, substances) matters.  The pertinent question is whether the Hospital's injury differs from the injury to the public at large.  Asserting that the injury occurs immediately rather than over time does nothing to answer that question.[21]

## IV.    THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED.

### A.    The Complaint Fails Adequately to Allege Duty.

The Hospital argues that "***statutory*** obligations concerning the administration and

---

[21]    The Opposition also misreads *Burgess v. M/V Tomano*, 370 F. Supp. 247 (D. Me. 1973), which held that fisherman had standing to bring public nuisance claims because they had directly experienced an oil spill's interference with the public right to fish in public waters; the court dismissed claims by town businessmen who alleged injuries (loss of revenue) "derivative from that of the public at large." *Id.* at 251.  Citing *Burgess*, the Florida Supreme Court has properly framed the standing inquiry as whether the plaintiff has "a special interest different from the general public."  *Curd v. Mosaic Fertilizer, LLC*, 39 So. 3d 1216, 1226–27 (Fla. 2010).  Like the *Burgess* businessmen, the Hospital lacks standing because its claims derive from direct injuries allegedly sustained by opioid users.

distribution of controlled substances" are the source of Distributors' alleged duty to it.  Opp. 42.
The Hospital concedes that those federal obligations to report suspicious pharmacy orders can be
enforced only by DEA, not by private litigants.[22]  But the Hospital ignores the obvious corollary
that a plaintiff cannot circumvent the prohibition of private rights of action by simply attaching a
different label to a cause of action for violation of the same duty.  That is exactly what the
Hospital does when it attaches a "negligence" label to its claim for violation of the regulatory
duty to report suspicious orders to DEA.

Citing *Kohl v. Kohl,* 149 So. 3d 127 (Fla. App. 2014), the Hospital argues that
Distributors' alleged statutory violations are "evidence of negligence."[23]  But *Kohl* explained
that evidence of a statutory violation does not "overhaul the negligence cause of action"; i.e.,
"the claimant still needs to prove all elements of actionable negligence."  *Id.*  As Florida law has
long recognized, a statutory violation is not "evidence of negligence" unless the plaintiff
"demonstrates that [it] suffered the type of injury the statute was designed to prevent, and that
violation of the statute was the proximate cause of [its] injury."  *Chevron U.S.A., Inc. v. Forbes*,
783 So. 2d 1215, 1220 (Fla. App. 2001) (citing *Walker v. Butler*, 461 So. 2d 249, 250 (Fla. App.
1984)).  The Hospital has not alleged (and cannot plausibly allege) that the federal reporting
regulations were "designed to prevent" under-reimbursement of opioid-related medical care.[24]
Nor can the Hospital plausibly allege proximate causation.  *See infra* Part V.

---

[22]  Opp. 40 (incorporating *Monroe County* opposition by reference); *see* Br. 17–18.

[23]  The Hospital's argument is also a tacit concession that it cannot state a claim for negligence *per se*
under *Kohl*, which defines two narrow categories of statutory violations that constitute negligence *per
se*, with other statutory violations "constituting mere *prima facie* evidence of negligence."  *Kohl,* 149
So. 3d at 132.

[24]  Full reimbursement of a hospital's posted charges are not the goal of federal policy generally.
Medicare and Medicaid do not reimburse the full amount of hospital charges, and federal law requires
the treatment of the indigent at hospital emergency rooms (as in the case of drug overdose events)
without provision for full reimbursement.

The Hospital, of course, can bring a common law negligence claim if it can show that there was a pre-existing duty running to it recognized at common law.  There is no such duty, as Distributors have explained in previous briefing.  *See* Summit Reply at Part III.B.; Broward Reply, Dkt. 827 at Part II.  Thus, any duty is a statutory or regulatory duty, not a common-law duty.  For a negligence claim to survive under Florida law, the plaintiff must be able to allege specifically that the defendant owed a duty to it.  *See, e.g.*, *Ankers v. Dist. Sch. Bd. of Pasco Cty.*, 406 So. 2d 72, 73 (Fla. App. 1981); *see also* Br. 19–20.  Because the regulatory reporting requirement explicitly runs only to DEA, there is no support for any argument that Distributors owe the Hospital a duty. [25]

**B.      The Hospital Has Failed Adequately to Allege Breach of Duty.**

The Hospital argues that its allegations of breach are "more than sufficient," Opp. 43, even though the Complaint does not identify (i) any pharmacy that placed a suspicious order, or (ii) any specific order that one of the Distributors should have reported or refused to supply, let alone (iii) any connection between such a failure and any patient who obtained injury purportedly suffered by the Hospital.  Br. 21.  The Hospital's wholly conclusory "breach" allegations do not suffice.  *See, e.g.*, *Banta v. Rosier*, 399 So. 2d 444, 445 (Fla. App. 1981) (deeming alleged breaches of duties deficient when "allege[d] … in conclusionary terms and not specifically").

**V.      THE HOSPITAL DOES NOT ADEQUATELY ALLEGE PROXIMATE CAUSE.**

The Opposition misstates Florida law—or misapplies it to ***Distributors***—in three respects.  First, the Opposition wrongly suggests that proximate cause is not a required element of public nuisance.  Opp. 38.  In Florida, "a plaintiff in a nuisance action must demonstrate that

---

[25]   The same is true for the redundant negligence claims the Hospital labels "negligent distribution" and "wanton negligence."  Both require that Distributors owed a duty to the Hospital.

the maintenance of the nuisance was the natural and proximate cause of the injury." *Durrance v. Sanders*, 329 So. 2d 26, 29–30 (Fla. App. 1976) (dismissing nuisance claim relating to air and water pollution where the alleged nuisance did not "proximately cause[] the injuries suffered by appellees"); *Shamhart v. Morrison Cafeteria Co.*, 32 So. 2d 727, 731 (Fla. 1947) (en banc) (dismissing public nuisance claim where defendant's conduct "was not the proximate cause of the injury").[26]  Second, it is settled Florida law that an individual's voluntary misuse of a product is the sole proximate cause of his injury from that product.[27]  Applying the rule, one Florida court has dismissed claims brought by an opioid user against pharmaceutical companies. *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346, 1356 (S.D. Fla. 2003) ("Florida courts routinely apply the doctrine of sole proximate cause when the user intentionally misuses a product to his detriment.").  And if individual users cannot recover for injuries arising out of their misuse of opioids, the Hospital cannot recover derivatively.[28]

Third, the Hospital fails to show how its injuries were the foreseeable result of *Distributors*' conduct.  All it offers is a single, conclusory assertion that Manufacturers'

---

[26]  The Hospital cites *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 49697 (E.D.N.Y. 2003), to suggest there is a "relaxed causation requirement," but that case contravenes the above-cited decisions by the Florida Supreme Court and the vast majority of jurisdictions across the country.  *See, e.g.*, *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 480–81 (6th Cir. 2017); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1138 (Ill. 2004); *State v. Lead Indus. Ass'n,* 941 A.2d 428, 451 (R.I. 2008).

[27]  *See, e.g.*, *Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358, 1361 (S.D. Fla. 2001) ("voluntary drinking of alcohol is the proximate cause of an injury," not "the manufacture or sale of [alcohol] to that person"), *aff'd*, 31 F. App'x 932 (11th Cir. 2002); *Clark v. Boeing Co.*, 395 So. 2d 1226, 1229 (Fla. App. 1981) (intentional misuse is the sole cause of the injury); *Watson v. Lucerne Mach. & Equip., Inc.*, 347 So. 2d 459, 461 (Fla. App. 1977) (plaintiff warned not to crawl into machine could not recover for doing just that).

[28]  The Hospital suggests that "patients may become addicted to opioids without any misuse by them whatsoever."  Opp. 49 n.141.  That allegedly occurs because the Manufacturers' allegedly deceptive marketing campaign changed the standard of care for prescribing opioids, causing doctors to prescribe them long-term for chronic pain.  That theory may mean that the marketing campaign proximately caused addiction, but it does nothing to establish that distribution to pharmacies that are filling prescriptions issued pursuant to the prevailing standard of care proximately caused addiction.

allegedly "fraudulent scheme to increase the volume of opioids prescribed and consumed …
[led] inevitably and foreseeably to the other harms associated with addiction."  Opp. 49 n.141.
Whatever the merits of this allegation *as to Manufacturers*, whose marketing campaign
allegedly changed the standard of care for prescribing opioids, it makes no sense as to
Distributors, who were only filling well-intentioned pharmacy orders that reflected the new
standard of care.

Even setting aside both patients' voluntary misuse *and* the implications of the new
standard of care allegedly created by Manufacturers' marketing, the chain of actions necessary to
connect Distributors to the Hospital's alleged injury is too attenuated for the Hospital's injury to
have been foreseeable.  As the Fourth Circuit explained, concerning nearly identical allegations
by West Virginia against wholesale distributors:

> [*T*]*he chain of causation is hardly direct*. The complaint claims the defendants
> distributed drugs to pharmacies, which then filled physicians' prescriptions for
> patients, some of whom were or became abusers, resulting in harm to the abusers
> and, as a result, to the state.  This is hardly the same as visible damage being
> openly visited as a direct result of the defendant's negligence….  *At most, there
> was a risk that some of the drugs might end up in an abuser's hands*.

*Liberty Mut. Fire Ins. v. JM Smith Corp.*, 602 F. App'x 115, 121 (4th Cir. 2015) (per curiam).[29]

A conclusion that Distributors' conduct foreseeably resulted in the Hospital's alleged
injury would render the proximate cause inquiry indistinct from but-for causation.  Mere logical
relatedness is not enough under Florida law.[30]  The Hospital cannot explain how Distributors'
conduct foreseeably resulted in the Hospital's injury, beyond the mere fact that Distributors are

---

[29]  If anything, the Fourth Circuit's analysis is under-inclusive.  It does not mention the DEA, which
exponentially raised production quotas between 1995 and 2013, reflecting its determination that the
legitimate need for opioid medications was increasing.  *See supra* p. 2 & n.1.

[30]  *See Heist v. Lock & Gunsmith, Inc.*, 417 So. 2d 1041, 1042 (Fla. App. 1982) (dismissal where retailer
sold gun to one individual, whose companion shot plaintiff ten days later); *Hoffman v. Bennett*, 477
So. 2d 43, 44 (Fla. App. 1985) (dismissal where building contractor left a dangerous chemical
unguarded, after which a teenager found it and threw it at plaintiff, causing injury).

part of the overall supply chain.  That is not enough.[31]

## VI.    THE CONSUMER FRAUD CLAIM SHOULD BE DISMISSED.

For the reasons stated in Distributors' *Broward County* reply, *see* Broward Reply at Part

VI, and the additional reasons given below, the Hospital's FDUTPA claim against Distributors

should be dismissed.  None of the Hospital's contrary arguments has merit.  First, the Hospital's

allegations do not meet Rule 9(b)'s heightened pleading standard.[32]  In arguing otherwise, the

Hospital points only to allegations (1) regarding non-Distributor defendants, or (2) that fail "to

identify the who, what, when, where, and how of the alleged fraud," as Rule 9(b) requires.  Opp.

60–61.  The Hospital is wrong that applying Rule 9(b) "goes directly against Judge Polster's

ruling in *Traxler* [*v. PPG Industries, Inc.*, 158 F. Supp. 3d 607, 630–31 (N.D. Ohio 2016)],"

where consumer protection, false advertising, and deceptive practices claims survived ***because***

***they satisfied Rule 9(b)***.

Second, the Opposition asserts that "Distributor[s] made fraudulent omissions in the

distribution of opioids," Opp. 62, but the Complaint alleges only that Distributors made

misstatements or omissions in reports ***to regulators***.  Compl. ¶¶ 617–660.  Such statements are

---

[31]    The Hospital's failure to plead proximate causation is fatal not only to its tort claims but also to its unjust enrichment claim.  *See, e.g.*, *Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Tr. Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 475 (S.D. W. Va. 2013) (dismissing unjust enrichment claims against drug manufacturer because "[b]etween Defendants' alleged misleading marketing and Plaintiffs' prescription reimbursements lies a vast array of intervening events"); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999) ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim … because of the remoteness of plaintiffs' injuries from defendants' wrongdoing."); *Tex. Carpenters Health Benefit Fund v. Philip Morris, Inc.*, 21 F. Supp. 2d 664, 678 (E.D. Tex. 1998) ("The Court finds that payment of the Participants' medical expenses did not enrich [the defendant].").

[32]    "Most courts" require FDUTPA claims sounding in fraud to satisfy Rule 9(b).  *Blair v. Wachovia Mortg. Corp.*, 2012 WL 868878, at *3 (M.D. Fla. Mar. 14, 2012).  The rule clearly applies where, as here, a plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).

not actionable under the FDUTPA because they are not made in "trade or commerce."  *Owens-Benniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300, 1321 (M.D. Fla. 2017).[33]  Third, Distributors' opening brief showed that the Complaint fails to allege, and could not plausibly allege, that statements made by Distributors in confidential reports to DEA were likely to deceive consumers.  Br. 25.  The Hospital responds by pointing to conclusory allegations that physicians and patients relied on misrepresentations by "Defendants."  Opp. 63.  But these purported misrepresentations allegedly were made by Manufacturers, not Distributors.  Compl. ¶ 905.  Finally, the Hospital's claim should also be dismissed for failure to plead "actual damages" under the FDUTPA.  *See* Broward Reply at Part VI.

## VII.   THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

The Hospital argues that it paid for Distributors' "externalities."  Opp. 53–55.  But being "forced to pay for [a defendant's] externalities" does "not fit within an unjust enrichment framework" under Florida law.  *City of Miami v. Citigroup Inc.*, 801 F.3d 1268, 1274 (11th Cir. 2015); Broward Reply Br. at Part III; *see also* Summit Reply at Part VI; Chicago Reply, Dkt. 827 at Part V.

The Hospital also asserts that it purchased opioids and other products from Distributors, Opp. 51–52, but the Complaint does not plead an unjust enrichment claim based on this theory.  Compl. ¶ 1006.  Nor does the Complaint contain any factual allegations regarding the Hospital's purported purchases from Distributors.  In any event, "it is settled law in Florida that when a defendant has given adequate consideration to someone for the benefit conferred," or where "an express contract exists concerning the same subject matter," a "claim of unjust enrichment fails."

---

[33]   The Hospital also asserts, without citation to any authority, that fraudulent omissions are actionable regardless of whether they "were first made to Plaintiff or another party."  Opp. 62.  That is not so. *See Miceli v. Dyck-O'Neal, Inc.*, 2016 WL 7666167, at \*6 (M.D. Fla. Aug. 9, 2016) (dismissing FDUTPA claim where the alleged conduct was directed at third parties, rather than plaintiff).

*Wiand v. Wells Fargo Bank, N.A.*, 86 F. Supp. 3d 1316, 1332 (M.D. Fla. 2015), *aff'd per curiam*, 677 F. App'x 573 (11th Cir. 2017).

The predicate for the Hospital's unjust enrichment theory, moreover, is that "Defendants … knew their opioid promotional and marketing policies would cause" hospitals "to provide unreimbursed healthcare." Compl. ¶ 1007; *see* Opp. 52 ("Defendants' incessant and misleading marketing campaigns"). But this theory necessarily fails ***as to Distributors*** because they played no role in the marketing of opioids to doctors. Br. 23; *see supra* pp. 1, 10 n.14. For a similar reason, the cases cited by the Hospital (at Opp. 55–56) purportedly excusing it from alleging a direct benefit conferred on Distributors are unavailing: most of those cases merely stand for the proposition that a ***consumer*** may bring a claim against the ***manufacturer*** of a product where the manufacturer "marketed its product directly to consumers," even if the consumer did not purchase the product directly from the manufacturer. *See, e.g.*, *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1326 (S.D. Fla. 2014).[34] Those cases do not hold—as would be relevant to Distributors here—that a consumer may assert a claim for unjust enrichment against the wholesale distributor that delivered the product from the manufacturer to the store at which the consumer made his purchase.

## VIII. THE IMPLIED WARRANTY CLAIM SHOULD BE DISMISSED.

The Opposition does not oppose any of the four bases for dismissing the claim against Distributors for breach of implied warranty of fitness for a particular purpose. Br. at 27–30. The Hospital has thus conceded that the claim should be dismissed. *See supra* p. 9 n.13.

---

[34] The remaining cases cited by the Hospital are even further afield. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Brown*, 2017 WL 1291995, at *6–7 (S.D. Fla. Mar. 30, 2017) (direct benefit conferred on corporate affiliate); *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1289 (S.D. Fla. 2013) (defendant "use[d] the [trade]mark and products" of plaintiff without license or payment).

Dated:  August 17, 2018                          Respectfully submitted,


<u>/s/ Robert A. Nicholas</u>                           <u>/s/ Enu Mainigi</u>
Robert A. Nicholas                               Enu Mainigi
Shannon E. McClure                               F. Lane Heard III
**REED SMITH LLP**                               Steven M. Pyser
Three Logan Square                               Ashley W. Hardin
1717 Arch Street, Suite 3100                     **WILLIAMS & CONNOLLY LLP**
Philadelphia, PA 19103                           725 Twelfth Street, N.W.
Tel: (215) 851-8100                              Washington, DC 20005
Fax: (215) 851-1420                              Tel: (202) 434-5000
rnicholas@reedsmith.com                          Fax: (202) 434-5029
smcclure@reedsmith.com                           emainigi@wc.com
                                                 lheard@wc.com
*Counsel for AmerisourceBergen Corporation*      spyser@wc.com
*and AmerisourceBergen Drug Corporation*         ahardin@wc.com


<u>/s/ Geoffrey Hobart</u>                             *Counsel for Cardinal Health, Inc.*
Geoffrey Hobart
Mark Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com


*Counsel for McKesson Corporation*

**LOCAL RULE 7.1(F) CERTIFICATION**

I, Ashley W. Hardin, hereby certify that this brief conforms to the reply page limitations

(20 pages) agreed upon by the parties in an e-mail exchange dated July 19, 2018.

/s/ Ashley W. Hardin
Ashley W. Hardin

**CERTIFICATE OF SERVICE**

I, Ashley W. Hardin, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

/s/ Ashley W. Hardin
Ashley W. Hardin